**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ALL EUROPEAN AUTO SUPPLY, INC.,
individually and on behalf of a class of all others
similarly situated,

        Plaintiff,

v.

DENSO CORPORATION, DENSO
INTERNATIONAL AMERICA INC., DENSO
PRODUCTS AND SERVICES AMERICAS, INC.,
NGK SPARK PLUG CO., LTD., NGK SPARK
PLUGS (U.S.A.), INC., NGK SPARK PLUGS
(U.S.A.) HOLDING, INC., NTK
TECHNOLOGIES, INC., ROBERT BOSCH
GMBH, and ROBERT BOSCH LLC,

        Defendants.

Case No. _____

## CLASS ACTION COMPLAINT

Plaintiff All European Auto Supply, Inc. ("Plaintiff"), individually and on behalf of the proposed class of direct purchasers of Oxygen Sensors (as defined below), brings this action against Defendants DENSO Corporation, DENSO International America Inc., DENSO Products and Services Americas, Inc. (f/k/a DENSO Sales California, Inc.), NGK Spark Plug Co., Ltd., NGK Spark Plugs (U.S.A.), Inc., NGK Spark Plugs (U.S.A.) Holding, Inc., NTK Technologies, Inc., Robert Bosch GmbH, and Robert Bosch LLC (collectively, "Defendants") and other unnamed co-conspirators, for damages under the antitrust laws of the United States and demands a jury trial, and, upon personal information as to the facts pertaining to itself and upon information and belief as to all other matters, hereby alleges as follows:

**INTRODUCTION**

1.      The United States Department of Justice (the "DOJ"), in conjunction with various domestic and foreign governmental agencies, is currently conducting an investigation into the automotive parts industry that one DOJ official described as "**appear[ing] to be the biggest criminal antitrust investigation that we've ever encountered**."   The DOJ's investigation encompasses a wide array of automotive parts and has already yielded billions of dollars in criminal fines, as well as dozens of prison sentences.

2.      Some of the parts being investigated include "Oxygen Sensors," as defined in more detail below, which are electronic sensors located before and after the catalytic convertor in the exhaust system and are used to measure the amount of oxygen in the exhaust.

3.      Defendants are competing manufacturers of Oxygen Sensors sold throughout the United States, or installed in motor vehicles manufactured or sold throughout the United States, that, together with their as-yet unknown co-conspirators, entered into an agreement, combination, or conspiracy to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for Oxygen Sensors.   This agreement, combination, or conspiracy constituted an unreasonable restraint of interstate trade and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

4.      Defendants NGK Spark Plug Co., Ltd. and Robert Bosch GmbH have already pled guilty to participating in a conspiracy to rig bids for, and to fix stabilize, and maintain the prices of, Oxygen Sensors (and other automotive parts) in violation of the Sherman Act, and paid criminal fines of $52.1 million and $57.8 million, respectively.   Defendant DENSO Corporation has already pled guilty to participating in similar conspiracies involving various other automotive parts.

5.      As a direct and foreseeable result of the unlawful and anticompetitive conduct alleged herein, Plaintiff, and others like it, paid artificially inflated prices for Oxygen Sensors during the period starting at least as early as January 1, 2000 and continuing to the present (the "Class Period").

6.      Plaintiff seeks to represent a class of direct purchasers consisting of all persons and entities who, during the Class Period, purchased Oxygen Sensors in the United States from one or more of the Defendants or their co-conspirators.

## JURISDICTION AND VENUE

7.      Plaintiff brings this action to obtain injunctive relief and to recover treble damages, costs of suit, and reasonable expenses and attorneys' fees, resulting from Defendants' violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.      The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

9.      The Court has personal jurisdiction over each of the Defendants as each of them, either directly or through the ownership or control of their United States subsidiaries, (a) resides in this District, (b) transacted business throughout the United States, including in this District, (c) sold or marketed substantial quantities of Oxygen Sensors throughout the United States, including in this District, (d) committed overt acts in furtherance of the conspiracy alleged herein in the United States, including in this District, (e) was engaged in a conspiracy that was directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities throughout the United States, including in this District, or (f) had substantial aggregate contacts with the United States as a whole, including in this District.

3

10.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, one or more of the Defendants reside in this District, and a substantial portion of the affected interstate trade and commerce has been carried out in this District.

## PARTIES

### Plaintiff

11.     Plaintiff All European Auto Supply, Inc. ("AEAS") is a Michigan corporation with its principal place of business in Royal Oak, Michigan.  AEAS purchased Oxygen Sensors directly from one or more of the Defendants and/or their co-conspirators during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

### Defendants

**The DENSO Defendants**

12.     Defendant DENSO Corporation is a Japanese corporation with its principal place of business in Kariya, Japan.  DENSO Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Oxygen Sensors that were purchased throughout the United States, including in this District, during the Class Period.

13.     Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.  DENSO International America, Inc., a wholly owned subsidiary of Defendant DENSO Corporation, manufactured, marketed, and/or sold Oxygen Sensors that were purchased throughout the United States, including in this District,

4

during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

14.     Defendant DENSO Products and Services Americas, Inc. (f/k/a DENSO Sales California, Inc.) is a corporation with its principal place of business in Long Beach, California. DENSO Products and Services Americas, Inc., a wholly owned subsidiary of Defendant DENSO Corporation, manufactured, marketed, and/or sold Oxygen Sensors that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

15.     Defendants DENSO Corporation, DENSO International America, Inc., and DENSO Products and Services Americas, Inc. are collectively referred to herein as "DENSO" or the "DENSO Defendants."

**The NGK Defendants**

16.     Defendant NGK Spark Plug Co., Ltd. is a Japanese corporation with its principal place of business in Nagoya, Japan.  NGK Spark Plug Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Oxygen Sensors that were purchased throughout the United States, including in this District, during the Class Period.

17.     Defendant NGK Spark Plugs (U.S.A.) Holding, Inc. is a Delaware corporation with its principal place of business in New Castle, Delaware.  NGK Spark Plugs (U.S.A.) Holding, Inc., a wholly owned subsidiary of Defendant NGK Spark Plug Co., Ltd., is the holding company for NGK Spark Plugs (U.S.A.), Inc., which manufactured, marketed, and/or sold Oxygen Sensors that were purchased throughout the United States, including in this District,

5

during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

18. Defendant NGK Spark Plugs (U.S.A.), Inc. is a West Virginia corporation with its principal place of business in Wixom, Michigan. NGK Spark Plugs (U.S.A.), Inc., a wholly owned subsidiary of Defendant NGK Spark Plug Co., Ltd., manufactured, marketed, and/or sold Oxygen Sensors that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent company NGK Spark Plugs (U.S.A.) Holding Inc., and/or the direction of its parent's parent, NGK Spark Plug Co., Ltd.

19. Defendant NTK Technologies, Inc. is a California corporation with its principal place of business in Santa Clara, California. NTK Technologies, Inc., a wholly owned subsidiary of Defendant NGK Spark Plug Co., Ltd., manufactured, marketed, and/or sold Oxygen Sensors that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

20. Defendants NGK Spark Plug Co., Ltd., NGK Spark Plugs (U.S.A.), Inc., NGK Spark Plugs (U.S.A.) Holding, Inc., and NTK Technologies, Inc. are collectively referred to herein as "NGK" or the "NGK Defendants."

**The Bosch Defendants**

21. Defendant Robert Bosch GmbH is a German company with its principal place of business in Stuttgart, Germany. Robert Bosch GmbH – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Oxygen Sensors

that were purchased throughout the United States, including in this District, during the Class Period.

22.     Defendant Robert Bosch LLC is a Delaware company with its principal place of business in Farmington Hills, Michigan.   Robert Bosch LLC, a wholly owned subsidiary of Defendant Robert Bosch GmbH., operates factories and distribution facilities in several states, including at least Illinois, Michigan, Massachusetts, Tennessee, and South Carolina.   Robert Bosch LLC, directly and/or through its affiliates, manufactured, marketed, and/or sold Oxygen Sensors that were purchased throughout the United States, including in this District, during the Class Period.   At all times during the Class Period, the activities of Robert Bosch LLC and its affiliates were under the control and direction of its parent company.

23.     Defendants Robert Bosch GmbH and Robert Bosch LLC are collectively referred to herein as "Bosch" or the "Bosch Defendants."

### AGENTS AND CO-CONSPIRATORS

24.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.   The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

25.     The acts alleged herein that have been performed by Defendants were authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of the Defendants' business affairs.

26.     Each Defendant acted as the agent, principal, or joint venturer of the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

7

27.     The acts alleged herein that have been performed by DENSO International America, Inc., DENSO Products and Services Americas, Inc., NGK Spark Plug (U.S.A.) Inc., NGK Spark Plugs (U.S.A.) Holding, Inc., NTK Technologies, Inc., and Robert Bosch LLC, were authorized, ordered, and condoned by their respective parent companies.

## FACTUAL ALLEGATIONS

### A.  Product Description: Oxygen Sensors

28.     "Oxygen Sensors" are electronic sensors located before and after the catalytic converter in the exhaust system used to measure the amount of oxygen in the exhaust.  Oxygen Sensors provide signals or data to the automobile's engine management computer, which then adjusts the ratio of air/fuel injected into the engine to compensate for excess air or excess fuel.

29.     One type of Oxygen Sensor is a standard or "narrow-band" oxygen sensor, which essentially detects two states: rich or lean.  The standard oxygen element is a ceramic thimble plated inside and out with electrodes that measure the difference in oxygen between the exhaust gas and the external air, then generates an output voltage depending on the difference between the two measured values.

30.     Another type of Oxygen Sensor is an air fuel ratio sensor.  This is a "wideband" oxygen sensor located before the catalytic convertor.  An air fuel ratio sensor is paired with a special interference circuit so it can produce an electric current corresponding to the actual proportion of exhaust gas oxygen concentration enabling more precise control of the air/fuel ratio injected into the engine.  This "wideband" sensor incorporates an electrochemical gas pump.  An electronic circuit containing a feedback loop controls the gas pump current so that the pump current directly indicates the oxygen content of the exhaust gas.

8

31.     Oxygen Sensors are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They also are installed in automobiles to replace failing, defective, or damaged Oxygen Sensors.

32.     Defendants and their co-conspirators supplied Oxygen Sensors which were: 1) manufactured in the United States and installed in motor vehicles manufactured in the United States or used for replacement parts for motor vehicles in the United States; 2) manufactured abroad, exported to the United States, and installed in motor vehicles manufactured and sold in the United States; and 3) manufactured abroad and exported into the United States for use as replacement parts for motor vehicles in the United States.

B.     The Oxygen Sensors Market

33.     The Oxygen Sensors market has certain characteristics that are conducive to a price-fixing conspiracy and that make Defendants' conspiracy more plausible, namely there are high barriers to entry and demand for the product is inelastic.

34.     There are substantial barriers to entry in the Oxygen Sensors market as any new entrant would face costly and lengthy start-up costs, including manufacturing plants and equipment, research and development, transportation, distribution infrastructure, the obtaining of skilled labor, and the existence of long-standing relationships between customers and suppliers.

35.     Demand for Oxygen Sensors is highly inelastic—*i.e.*, sellers of Oxygen Sensors can increase prices with little or no decline in units sold.  This is because there are no viable substitutes for these products and an Oxygen Sensor is an essential part of modern motor vehicles (even if prices are kept at a supra-competitive level).

9

### C. The Request for Quotation Process

36.     When procuring parts such as Oxygen Sensors for manufacturing a new motor vehicle, an OEM issues a Request for Quotation ("RFQ").  Automotive parts manufacturers, such as the Defendants, then submit a bid or quotation to the OEM in response to the RFQ.

37.     The RFQ process is designed to obtain competitive, independent bids from multiple suppliers.  To that end, an OEM will issue the RFQ to multiple competing parts suppliers, those suppliers will submit bids, and the OEM will select a winner (usually the lowest bid).  Sometimes, before selecting the winner, an OEM or the suppliers may revise the technical specifications, and revised bids will be submitted.

38.     The parts purchased by the OEM in connection with that RFQ are purchased from the winning parts manufacturer for the lifespan of the motor vehicle model, which on average is between four to six years.  During that time frame, whenever an OEM purchases Oxygen Sensors for that motor vehicle model, the OEM purchases the Oxygen Sensors from the parts manufacturer who won the RFQ and was awarded the supply contract, at the price set by that supply contract.

39.     The prices set by the RFQ process are also used when direct purchasers other than the OEM who issued the RFQ purchase Oxygen Sensors from the Defendants, such as those purchasing Oxygen Sensors to replace parts as they become worn or damaged.  Every subsequent purchaser who buys Oxygen Sensors from that Defendant pays at least the winning price set by the RFQ or higher.

40.     Thus, the RFQ process described above not only sets the prices for Oxygen Sensors incorporated into new motor vehicles manufactured by that particular OEM, it also sets

the price floor for all other direct purchasers, including those making purchases for use as replacement and aftermarket parts.

**D. Defendants' Oxygen Sensors Conspiracy**

41.     During the Class Period, Defendants and their co-conspirators engaged in a single conspiracy to raise, fix, maintain, and/or stabilize prices for Oxygen Sensors by price-fixing, rigging bids for, and allocating the market and customers of Oxygen Sensors sold in or into the United States.

42.     In furtherance of the conspiracy, Defendants participated in meetings, telephone conversations, emails, and other communications in order to allocate the supply of Oxygen Sensors, rig bids quoted to automobile manufacturers for the sale of Oxygen Sensors and to fix, stabilize and maintain prices of Oxygen Sensors sold to automobile manufacturers in or into the United States, and agreed to rig bids and allocate the supply of those Oxygen Sensors. Defendants then submitted as part of the RFQ process bids and price quotations to the OEMs in accordance with those conspiratorial agreements.

43.     Defendants knew and intended that their conduct would impact not only Oxygen Sensors sold to the OEMs as a result of the rigged bidding processes, but also the Oxygen Sensors sold to all direct purchasers throughout the United States.

44.     This was because the conspiracy permitted the Defendants to fix, raise, maintain, and/or stabilize the prices paid by OEMs in order to set a floor for the prices paid by all other direct purchasers of Oxygen Sensors.

45.     As a result of the conspiracy, OEMs and all or nearly all other direct purchasers of Oxygen Sensors paid supra-competitive prices for those products.

### E.  Government Investigations and Guilty Pleas

46.    Government officials in the United States, Europe, Canada, and Japan have been involved in a globally coordinated antitrust investigation for several years involving automotive parts, including Oxygen Sensors.  The investigation began in Europe after some European OEMs lodged a complaint with the European Commission ("EC").

47.    As a result of this investigation, United States, European, and Japanese authorities executed surprise raids in February 2010 at the offices of several automotive parts manufacturers, including some of the Defendants.  To obtain search warrants for the raids conducted in the United States, the government was legally required to demonstrate probable cause that it would obtain evidence of an antitrust violation as result of executing the warrant—*i.e.*, the United States must have presented sufficient evidence to the magistrate to convince him or her that a person of reasonable caution would believe that raiding these offices would uncover additional evidence of antitrust violations.

48.    As of the filing of this Complaint, thirty-five (35) companies and twenty-nine (29) executives have pled guilty or agreed to plead guilty as a result of the DOJ's automotive parts investigation, resulting in more than <u>$2.5 billion in criminal fines and dozens of prison sentences</u>.

49.    According to the FBI's Special Agent in Charge Andrew G. Arena, "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold."

**NGK and Bosch Have Pled Guilty to Price-Fixing Oxygen Sensors**

50.     On August 19, 2014, the DOJ announced that Defendant NGK Spark Plug Co., Ltd. agreed to plead guilty to participating in a conspiracy regarding Oxygen Sensors and other parts from at least as early as January 2000 until at least July 2011.  As part of its guilty plea, NGK agreed to pay a $52.1 million fine.

51.     Defendant NGK Spark Plug Co., Ltd. pled guilty to participating in a combination or conspiracy to fix, stabilize, and maintain the prices of automotive parts, including Oxygen Sensors, in violation of the Sherman Act

52.     Its plea agreement covered not only itself but its "Subsidiaries," including Defendants NGK Spark Plugs (U.S.A.), Inc., NGK Spark Plugs (U.S.A.) Holding, Inc., and NTK Technologies, Inc.   Furthermore, it included a promise by the DOJ not to prosecute its "[s]ubsidiaries for any act or offense committed before the date of signature of this Plea Agreement that was undertaken in furtherance of an antitrust conspiracy involving the manufacture or sale of spark plugs, standard oxygen sensors, or air fuel ratio sensors."   In addition, the NGK plea agreement required cooperation from its subsidiaries (including Defendants NGK Spark Plugs (U.S.A.), Inc., NGK Spark Plugs (U.S.A.) Holding, Inc., and NTK Technologies, Inc.).

53.     According to the Information filed against it, Defendant NGK Spark Plug Co., Ltd. and its co-conspirators carried out their conspiracy by, among other things:

> (a)     participating in meetings, conversations, and communications in Germany and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of spark plugs, standard oxygen sensors, and air fuel ratio sensors sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis or an engine-specific basis;

(d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers in Japan and elsewhere;

(e)    submitting bids, price quotations, and price adjustments to certain automobile manufacturers in Japan and elsewhere in accordance with the agreements reached;

(f)    selling spark plugs, standard oxygen sensors, and air fuel ratio sensors to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)    accepting payment for spark plugs, standard oxygen sensors, and air fuel ratio sensors sold to certain automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices; and

(h)    engaging in meetings, conversations, and communications in Japan and Germany for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

54.    On March 31, 2015, the DOJ announced that Defendant Robert Bosch GmbH had agreed to pay a $57.8 million fine and plead guilty to a one-count Information charging it with conspiring to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the prices of, (a) spark plugs and oxygen sensors sold from at least as early as January 2000 until at least July 2011, and (b) starter motors sold from at least January 2009 until at least June 2010.

55.    According to Deputy Assistant Attorney General Brent Snyder of the Antitrust Division's Criminal Enforcement Program, "The participants in this conspiracy were not located

14

in just one country or region of the world." Snyder further stated, "Collusion related to automotive parts was global in nature and our efforts to hold responsible companies and individuals accountable for the resulting harm to U.S. consumers and businesses."

56.    The Information against Bosch stated that it carried out its conspiracy using substantially similar means as those described above with respect to NGK.

**DENSO Has Pled Guilty to Price-Fixing Other Automotive Parts**

57.    On January 30, 2012, the DOJ announced that Defendant DENSO Corporation had agreed to pay a $78 million fine and plead guilty to a two-count criminal Information charging it with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, electronic control units ("ECUs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and until at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (2) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

58.    According to the criminal Information filed against it, Defendant DENSO Corporation and its co-conspirators carried out their conspiracies by:

> (a)    participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to certain automobile and internal combustion engine manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile and internal combustion engine manufacturers;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of automotive parts sold to automobile and internal combustion engine manufacturers in the United States and elsewhere, in some cases on a model-by-model or an engine-specific basis;

(d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile and internal combustion engine manufacturers in the United States and elsewhere;

(e)    submitting bids, price quotations, and price adjustments to certain automobile and internal combustion engine manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)    selling automotive parts to certain automobile and internal combustion engine manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)    accepting payment for automotive parts sold to certain automobile and internal combustion engine manufacturers in the United States and elsewhere at collusive and non-competitive prices;

(h)    engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)    employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

**The KFTC Has Fined NGK and DENSO For Price-Fixing Sensors**

59.    Moreover, in March 2015, it was announced that the Korea Fair Trade Commission ("KFTC") had fined DENSO, NGK, and certain of their affiliated companies 3.5 billion won (approximately $3.17 million USD) for forming a price-fixing cartel regarding exhaust gas temperature sensors. DENSO avoided further penalties by voluntarily reporting its own violations to the KFTC.

## ANTITRUST INJURY

60.     Defendants' conspiracy suppressed price competition among Defendants, causing prices for Oxygen Sensors to be artificially inflated throughout the Class Period.

61.     As a result, Plaintiff and the members of the Class paid supra-competitive prices for Oxygen Sensors and were deprived of the benefits of a competitive market throughout the Class Period.

62.     Therefore, as a direct and foreseeable result of Defendants' conspiracy, Plaintiff and the members of the Class have been injured in their business or property in that they paid more for Oxygen Sensors than they would have in the absence of Defendants' unlawful and anticompetitive conduct.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action both on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3). The Class is defined as follows:

> All individuals and entities that purchased Oxygen Sensors in the United States directly from one or more Defendants or their co-conspirators (or their controlled subsidiaries, affiliates, or joint ventures) from January 1, 2000 through the present.

64.     There are questions of law or fact common to the Class, including, but not limited to, the following:

(a)     Whether Defendants engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize prices of Oxygen Sensors sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

17

    (c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

    (d)    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

    (e)    Whether the contract, combination, or conspiracy caused Oxygen Sensors prices to be higher than they would have been in the absence of Defendants' conduct;

    (f)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the other Class members;

    (g)    Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and other Class members;

    (h)    Whether Plaintiff and other Class members are entitled to injunctive relief and, if so, the nature and extent of such relief; and

    (i)    The appropriate class-wide measure of damages.

65.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

66.    Plaintiff does not know the exact number of Class members, such information being in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiff believes that the members of the Class are so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

67.    Plaintiff's claims are typical of the claims of the Class because Plaintiff directly purchased Oxygen Sensors from one or more of the Defendants and/or their co-conspirators, all

Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiff is common to the Class.

68.     Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is a direct purchaser of Oxygen Sensors and has no conflict with any other members of the Class.  Furthermore, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

69.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

70.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

71.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

72.     The Class is also readily definable and is one for which records likely exist in the files of Defendants.

## PLAINTIFF'S CLAIMS ARE TIMELY

73.     Plaintiff and the members of the Class had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, August 19, 2014.  On that date, the DOJ publicly announced the impending guilty pleas of Defendant NGK Spark Plug Co., Ltd. with respect to Oxygen Sensors.

74.     As a result, Plaintiff and the members of the Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the

conspiracy alleged herein, until August 19, 2014. Prior to that time, there was insufficient information to suggest that any of the Defendants was involved in a conspiracy to fix prices, rig bids, or allocate the market for Oxygen Sensors.

75.     Moreover, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the members of the Class until at least August 19, 2014. Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the Class Period began.

76.     Defendants' conspiracy, by its very nature, was inherently self-concealing. Moreover, because Oxygen Sensors are not exempt from antitrust regulation, and because the price for Oxygen Sensors was set through an RFQ process that Plaintiff and members of the class had reason to believe was competitive, Plaintiff and the members of the Class reasonably believed they were making Oxygen Sensors purchases in a competitive industry.

77.     In addition, as evidenced by DENSO's Information, Defendants took affirmative steps to conceal their conspiracy and carry it out in a manner that would preclude detection. For example, Defendants have used code names and met in remote locations in order to keep their anticompetitive conduct secret.

78.     Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiff and the members of the Class did not learn or discover the operative facts giving rise to this Complaint prior to August 19, 2014. No information, actual or constructive, was ever made available to Plaintiff and the members of the Class that would have led a reasonably diligent person to investigate whether a conspiracy existed prior to August 19, 2014.

79.    For these reasons, the statute of limitations applicable to Plaintiff and the Class's claims did not begin to run or were otherwise tolled until August 19, 2014.

**CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
**(Against All Defendants)**

80.    Plaintiff incorporates by reference all of the above allegations as if fully set forth herein.

81.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination, or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Oxygen Sensors sold in or into the United States.

82.    As horizontal competitors, Defendants' agreement, combination, or conspiracy thus constitutes a *per se* violation of the federal antitrust laws.

83.    In accordance with this agreement, combination, or conspiracy, Defendants and their co-conspirators endeavored to and succeeded in rigging bids, allocating the market, and fixing prices for Oxygen Sensors sold in or into the United States during the Class Period.

84.    In furtherance of their conspiracy, Defendants and their co-conspirators took at least the following affirmative actions:

(a) Participated in meetings, conversations, and communications to discuss the bids and price quotations for Oxygen Sensors to be submitted to direct purchasers in the United States;

(b) Agreed on bids and price quotations to be submitted to direct purchasers in the United States;

(c) Submitted bids and price quotations to direct purchasers of Oxygen Sensors in accordance with the agreements reached;

21

(d) Manipulated prices and allocated supply of Oxygen Sensors sold in or into the United States;

(e) Coordinated price adjustments for Oxygen Sensors sold in or into the United States;

(f) Sold Oxygen Sensors in or into the United States at supra-competitive prices; and

(g) Actively concealed the true nature of their unlawful conduct from Plaintiff and the members of the Class in furtherance of the conspiracy.

85.     As a direct and proximate result of the conduct described above, Plaintiff and the members of the Class have been injured in their business and property in that they paid more for Oxygen Sensors during the Class Period than they would have absent the anticompetitive conduct of Defendants and their co-conspirators.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class proposed herein, and respectfully requests the following relief:

A.     That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.     That Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  May 20, 2015                              Respectfully submitted,


                                                   _/s/ Aubrey H. Tobin_____
                                                  Aubrey H. Tobin (P31256)
                                                  Attorney at Law, P.C.
                                                  2140 Walnut Lake Road
                                                  West Bloomfield, MI 48323
                                                  Telephone: (248) 932-3070
                                                  Aubrey@tobinpc.com

                                                  M. John Dominguez
                                                  COHEN MILSTEIN SELLERS
                                                  & TOLL PLLC
                                                  2925 PGA Boulevard, Suite 200
                                                  Palm Beach Gardens, FL 33410
                                                  Telephone: (561) 515-1431
                                                  jdominguez@cohenmilstein.com

David A. Young
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Ave. NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
dyoung@cohenmilstein.com

Matthew W. Ruan
COHEN MILSTEIN SELLERS
& TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
mruan@cohenmilstein.com

Christopher J. Cormier
COHEN MILSTEIN SELLERS
& TOLL PLLC
2443 S. University Boulevard, #232
Denver, CO 80210
Telephone: (720) 583-0650
ccormier@cohenmilstein.com

Solomon B. Cera
Thomas C. Bright
Pamela A. Markert
CERA LLP
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Telephone: (415) 777-2230
scera@cerallp.com
tbright@cerallp.com
pmarkert@cerallp.com